# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## AT BECKLEY

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 5:20-cr-00032

ZACHARY MITCHEM,

### MEMORANDUM OPINION AND ORDER

Pending is Defendant's Motion to Suppress [Doc. 33], upon which the Court held an evidentiary hearing on March 5, 2021.

Having received the parties' supplemental briefs, the matter is ready for adjudication.

### I.

On July 5, 2019, at approximately 10:00 a.m., Beckley Police Department Corporal Naomi Cook ("Corporal Cook") was dispatched to conduct a welfare check at the Beckley Family Dollar store. Upon arrival, Corporal Cook observed a black Chevrolet Impala with its engine running. She parked her police cruiser approximately three to four feet behind the Impala. [Doc. 81 at 31]. When she approached the vehicle, she saw "a white male leaning on the driver side door in what appeared to be a passed out condition . . . ." [Doc. 33-1]. Corporal Cook unsuccessfully attempted to wake the driver by knocking on the window of the driver's side door. [Doc. 81 at 7, 8]. Out of concern for his wellbeing, Corporal Cook opened the door, after which the occupant awoke. [*Id.* at 7]. The driver was then identified as Defendant Zachary Mitchem. [Doc. 33-1].

While speaking with Mr. Mitchem, Corporal Cook observed "a folded bundle of cash secured with a rubber band inside the door handle of the driver side door." *Id*. Corporal Cook then "advised Mitchem to exit the vehicle, at which time [she] observed a clear plastic bag containing a clear, crystalline rock inside the vehicle in plain view."[1] *Id*. Importantly, Corporal Cook noted that Mr. Mitchem's speech was slurred, and he was acting lethargic. [Doc. 81 at 10]. At that point, Mr. Mitchem was placed in handcuffs and his person was searched. The search revealed another bundle of cash and a bag containing suspected heroin. *Id*. at 11.

Mr. Mitchem was subsequently arrested and verbally consented to a search of his vehicle. Corporal Cook discovered a backpack in the front passenger seat containing a Kimber 1911 .45 caliber handgun, digital scales, a baggie containing suspected methamphetamine, and multiple other plastic baggies. [Docs. 81 at 13, 33-1]. Upon further examination and laboratory analysis, Mr. Mitchem was found to possess over $4,000, approximately 23 grams of methamphetamine, approximately 14 grams of heroin, and 5.5 alprazolam tablets. [Doc. 33-1]. He was charged with possession with intent to distribute and being a felon in possession of a firearm. [Doc. 1].

Mr. Mitchem now moves to suppress all evidence seized during the search on July 5, 2019. He challenges (1) the initial seizure putatively resulting from Corporal Cook blocking his

---

[1] Corporal Cook states in her incident report, filed at the time of the subject event, that she observed the suspected methamphetamine *after* she ordered Mr. Mitchem out of his vehicle. [Doc. 80-3]. During the evidentiary hearing, however, she testified that she observed the substance *prior* to ordering Mr. Mitchem out of his vehicle. [Doc. 81 at 28]. Given the demeanor of Corporal Cook during her testimony, which was marked by her forthrightness and frank affect, the Court does not attribute the contradiction to prevarication but rather to an honest effort on her part to recollect the actual chain of events as they unfolded. Nevertheless, the Court will treat the suspected methamphetamine as being in plain view to Corporal Cook after Mr. Mitchem exited his vehicle.

vehicle with her cruiser, (2) Corporal Cook ordering him out of the Impala, and (3) introduction of the resulting inculpatory physical evidence.

## II.

The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Court is required to ascertain "at what point in [the subject] encounter the Fourth Amendment becomes relevant." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). A court must thus probe the time at which a seizure, search, or both, occurred.

A seizure occurs when an officer employs "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry*, 392 U.S. at 19 n.16). "Generally speaking, a 'seizure' warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).

For a seizure to be constitutional, it must not be unreasonable. "The protection against unreasonable seizures includes brief investigatory stops." *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc) (internal quotation marks omitted). Seizures falling into the category of investigatory detentions are commonly referred to as "*Terry* stops." *See Terry*, 392 U.S. 1. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). "In assessing a *Terry* stop's validity, we consider the totality of the circumstances," such

that "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see United States v. Sokolow*, 490 U.S. 1, 8–10 (1989).

The reasonable suspicion standard is "less demanding . . . than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123 (internal quotation marks omitted) (quoting *Terry*, 392 U.S. at 27). The officer must still, however, "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Williams*, 808 F.3d at 246 (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). The "suspicion must also provide 'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'" *United States v. Cloud*, --- F.3d ----, No. 20-4091, 2021 WL 1342917, at *8 (4th Cir. Apr. 12, 2021) (quoting *Wingate v. Fulford*, 987 F.3d 299, 305 (4th Cir. 2021) *as amended* (Feb. 5, 2021) (emphasis in original) (citations omitted)).

"The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013). Although district courts are instructed to "give due weight to common sense judgments reached by officers in light of their experience and training," *Perkins*, 363 F.3d at 321, "an officer's reliance on a mere 'hunch' is insufficient to justify a stop." *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *see also United States v. Drakeford*, --- F.3d ----, No. 19-4912, 2021 WL 1152937 (4th Cir. Mar. 26, 2021). The officer must provide "some minimal level of objective justification" for making the stop. *I.N.S. v. Delgado*, 466 U.S. 210, 217 (1984); *United States v. Hardesty*, No. 1:20CR66, 2021 WL 275495, at *2 (N.D. W. Va. Jan. 27, 2021).

Our Court of Appeals recently revisited the reasonable suspicion standard. In *Drakeford*, the officers relied upon the following in determining that reasonable suspicion existed:

> [G]eneral information from a confidential informant; two interactions that officers believed were consistent with the manner in which illegal drugs are bought and sold, but in which no drugs were found; and a single officer witnessing a handshake between Appellant and another man and concluding that it was a hand-to-hand drug transaction, even though the officer did not see anything exchanged.

*Drakeford*, 2021 WL 1152937, at *1. These considerations, along with the public nature of the transaction "in broad daylight, outside of the vehicles, and in front of a security camera," resulted in a lack of reasonable suspicion. *Id.* The Court of Appeals concluded no more than an impermissible hunch was involved. *Id.*

The decision in *Terry* and its considerable progeny are also relevant respecting the point at which a lawful search of the person begins following a *Terry* stop. The demarcation point is that moment when the officer "reasonably suspect[s] that the person stopped is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). Importantly, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Regarding the standard for a lawful arrest, "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Wingate*, 987 F.3d at 308 (quoting *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Livingston v. S.C. Dep't of Soc. Servs.*, No. 20-1552, 2021 WL 1546097, at *3 (4th Cir. Apr. 20, 2021) (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)) (intervening citations omitted). The inquiry is governed by the flexible "'totality-of-the circumstances'

approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983)).

In West Virginia, "Probable cause to make a misdemeanor arrest without a warrant exists when the facts and circumstances within the knowledge of the arresting officer are sufficient to warrant a prudent man in believing that a misdemeanor is being committed in his presence." Syl., *Simon v. West Virginia Dep't of Motor Vehicles*, 181 W. Va. 267, 382 S.E.2d 320 (1989); *see* syl. pt. 2, *Carroll v. Stump*, 217 W. Va. 748, 619 S.E.2d 261 (2005) ("A person is 'charged' with an offense, for the purposes of W. Va. Code § 17C–5A–1 (1994), when he or she is lawfully arrested by a law-enforcement officer having probable cause to suspect the person was driving a motor vehicle under the influence of alcohol, controlled substances or drugs.").

Regarding the search of a vehicle, the automobile exception to the warrant requirement permits police officers to do so if the conveyance is "readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam) (citing *California v. Carney*, 471 U.S. 386, 393 (1985)). Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" *United States v. Kelly*, 592 F.3d 586, 590 (4th Cir. 2010) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

### III.

#### A.     *Blocking of the Impala*

Mr. Mitchem first contends he was seized when Corporal Cook blocked his vehicle. Our Court of Appeals has recently reiterated, however, that a cognizable seizure is a two-part

affair, dependent upon both (1) a show of authority by law enforcement, and (2) the accused submitting thereto. *Cloud*, 2021 WL 1342917; *see United States v. Stover*, 808 F.3d 991, 995–96 (4th Cir. 2015); *see also United States v. Mendenhall*, 446 U.S. 544 (1980).

In *Cloud*, the defendant's vehicle was parked outside of a motel room. *Cloud*, 2021 WL 1342917, at *1. The defendant was inside the motel room when officers arrived and parked their marked police cruiser approximately eight to twelve feet behind the defendant's vehicle. There was insufficient space for the vehicle to exit. *Id*. Soon after, the defendant left the motel room. He saw the officers speaking to occupants in his vehicle. *Id*. at *2. The defendant contended that the officers seized him upon parking behind his vehicle. *Id*. at *5. The Court of Appeals disagreed "because even if the parked vehicle alone constituted a 'show of authority,' there is no evidence that [the defendant] was aware of it, much less acquiesced." *Id*.

Inasmuch as Mr. Mitchem was unaware that his car was blocked given his somnambulant state, the mere blocking of his vehicle is of no Fourth Amendment consequence.

B.   *The Directive to Exit the Impala*

When Corporal Cook ordered Mr. Mitchem out of his vehicle and he complied, he was seized for Fourth Amendment purposes. Mr. Mitchem asserts the directive was unsupported by reasonable suspicion inasmuch as Corporal Cook relied upon only (1) a single bundle of an unknown amount of currency, and (2) Mr. Mitchem being asleep. [Doc. 83 at 12]. The Government responds that (1) Corporal Cook had difficulty rousing Mr. Mitchem, (2) he exhibited slurred speech, and (3) there was a wrapped bundle of cash which concerned Corporal Cook, as she thought it might have been related to drug trafficking. [Doc. 84 at 8, 9]. The Government

additionally asserts Corporal Cook's actions were entirely consistent with the community caretaking doctrine. *Id*.

Based upon the testimony received during the hearing, the Court finds the following facts were known to Corporal Cook at the subject time: (1) she was dispatched to conduct a welfare check at the Family Dollar parking lot at approximately 10:00 a.m., (2) Mr. Mitchem appeared to be unconscious in his vehicle with the engine running, and (3) she saw a bundle of cash secured by a rubber band in the driver's side door pull.

We do not have here a law enforcement officer merely happening upon a parked vehicle with the driver dozing. The intervening welfare check request means a third party, with no apparent ulterior motive, was concerned about the situation and contacted the authorities. Law enforcement found, as reported, an individual unconscious in his vehicle. The vehicle was not parked outside of a residence. It was instead immobile in a public parking lot, with its engine running, during the morning hours in the parking row closest to an operating storefront. Corporal Cook could not be expected to leave the situation as she found it. The driver may have been incapacitated. The shifter may not have even been in the "park" position.

But when Corporal Cook approached the vehicle, and Mr. Mitchem was unaroused by her knocking on his window, the situation changed markedly from an objective standpoint. The events would have heightened any existing concerns about the driver's condition. And those concerns might have properly included not only extreme exhaustion or the use of controlled substances, but also a medical event, including an overdose or cardiac issue. Corporal Cook was thus entirely justified in opening the door, at which time she saw the bundle of cash and Mr. Mitchem finally awoke.

Corporal Cook then immediately developed additional concerns, based upon her training and experience, about Mr. Mitchem resting his head against the window rather than reclining in his seat -- a position indicative of incapacitation rather than mere fatigue. [Doc. 81 at 41]. Of greater moment was the fact that the cash was bundled with a rubber band and thus illustrative of what Corporal Cook deemed to be a common, drug-trafficking modus. [*Id*. at 9]. Those concerns were objectively justified. It is apparent -- and has been for quite some time -- that this type of money banding is occasionally, if not often, associated with the drug trade. *See*, *e.g.*, *United States v. $242,484.00*, 389 F.3d 1149, 1161–62 (11th Cir. 2004) (noting that rubber-banded money may be indicative of connection to drug activity); *United States v. Morris*, No. 12-1581, 533 Fed. App'x 538, 541 (6th Cir. Aug. 8, 2013); *United States v. Fisher*, No. 07-2314, 322 Fed. App'x 207, 208 (3d Cir. Apr. 16, 2009) ("The search resulted in the discovery of two firearms, numerous packages of crack cocaine, and over $13,000 in cash wrapped in rubber bands."); *United States v. $11,320.00 in U.S. Currency*, 880 F. Supp. 2d 1310, 1326 (N.D. Ga. 2012) ("Further, the fact that the Defendant Currency was packaged in bundles wrapped with rubber bands is probative of a connection to illegal activity, given the law enforcement officers' testimony that, in their experience, individuals engaged in drug activity commonly package money that way."); *United States v. $60,020.00 U.S. Currency*, 41 F. Supp. 3d 277, 287 (W.D.N.Y. 2011). Our own Court of Appeals has apparently observed such a connection. *See United States v. Kellam*, 568 F.3d 125, 141 (4th Cir. 2009) ("At trial, the prosecution presented compelling evidence—in addition to the drug quantities that Kellam possessed—showing that she intended to distribute crack cocaine. *See*, *e.g.*, J.A. 223–24 (testimony of Trooper Seagle on Count Seventeen that Kellam had over $1300 in cash in her purse on April 4, 2006, some of which was bundled with rubber bands); *id*. at 271

(testimony of Floyd that cash rolled up with rubber band is 'generally money that [dealers] set aside to . . . purchase more crack-cocaine to sell later') . . . .").

Based upon the foregoing, Corporal Cook possessed ample reasonable suspicion to open the Impala door and direct Mr. Mitchem to exit the vehicle. At the minima, (1) the welfare check, (2) the location of the energized vehicle, and (3) his failure to respond to stimuli justified the former, and his obviously impaired state and the roll of cash supported the latter.

### C. *The Balance of the Encounter*

Once Mr. Mitchem exited the vehicle, Corporal Cook noticed in plain view a clear plastic bag containing a clear, crystalline rock. She also observed Mr. Mitchem's slurred speech and lethargy, despite the presence of law enforcement and a developing situation that was -- to put it mildly -- not supportive of his interests. These circumstances objectively and justifiably ratcheted Corporal Cook's suspicions. They also objectively justified Mr. Mitchem being cuffed and arrested for, *inter alia,* unlawful possession of a controlled substance and driving under the influence.[2] The facts and circumstances within Corporal Cook's knowledge were sufficient to

---

[2] Mr. Mitchem might well not have ultimately suffered a conviction for driving while intoxicated inasmuch as Corporal Cook did not actually witness him operating the vehicle. *See, e.g.,* Syl. pt. 3, *Carte v. Cline*, 200 W. Va. 162, 488 S.E.2d 437 (1997) (finding running engine and engaged transmission, along with admission of driving sufficient to establish driving); *Dale v. Ciccone*, 233 W. Va. 652, 662, 760 S.E.2d 466, 476 (2014) (finding admission of alcohol consumption and driving prior to stop was sufficient to find driving under the influence); *Dale v. Reynolds*, No. 13-0266, 2014 WL 1407375, at *3 (W. Va. Apr. 10, 2014) (memorandum decision) (finding driver's admission as to where he began drinking, admitted movement of car to location of stop, and discovering driver "unresponsive, in the vehicle with the engine running, lights on, and not parked in a parking spot" sufficient to establish driving); *Cain v. W. Va. Div. of Motor Vehicles*, 225 W. Va. 467, 472, 694 S.E.2d 309, 314 (2010) (finding that when driver "awakened from his drunken stupor" stating "'he was just trying to get home,'" and absence of vehicle from location less than thirty minutes prior was sufficient to establish driving); *Montgomery v. W. Va. State Police*, 215 W. Va. 511, 517, 600 S.E.2d 223, 229 (2004) (finding sufficient evidence of driving while intoxicated to substantiate discharge where driver was found asleep in vehicle with

warrant the prudent belief that, at a minimum, a misdemeanor was being committed in her presence.

Inasmuch as Mr. Mitchem was then under lawful arrest, the ensuing search of his person was likewise consistent with settled Fourth Amendment law. *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) ("The fact of a lawful arrest, standing alone, authorizes a search.") (cleaned up) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979)). And then, with the discovery of contraband on his person -- and even assuming his impaired state compromised his ability to consent -- governing law also authorized that physical investigation of the Impala. *United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013); *Kelly*, 592 F.3d at 590.

Moreover, Corporal Cook was dispatched to the Family Dollar to perform a welfare check. A welfare check is part of an officer's community caretaking function. The Court recognizes that "when police officers are engaged in 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,' the officers may conduct a search or a seizure without probable cause or a warrant (the community caretaking exception)." *United States v. Marshall*, 747 Fed. App'x 139, 144 (4th Cir. 2018) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "The community caretaking doctrine requires a court to look at the *function* performed by a police officer." *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (emphasis in original). "When analyzing a search made as the result of a routine police procedure . . . the court should examine the programmatic purpose of the policy—whether it was animated by community caretaking considerations or by law enforcement concerns." *Id*.

---

lights on and engine running). That intricate question of law is of no consequence at the arrest stage.

The general, unremarkable policies of local police departments to conduct welfare checks in response to concerns for the health and safety of an individual are undeniably derived from a community caretaking consideration. Indeed, when Corporal Cook was checking on the welfare of Mr. Mitchem, she was acting as a caretaker of the community by providing aid and assistance to an individual unconscious in a vehicle with the engine running. Her efforts were "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441. As such, the community caretaking doctrine is applicable, and the warrantless seizure was appropriate on independent grounds.

## III.

Based on the foregoing, the Court detects no deprivation of Mr. Mitchem's Fourth Amendment rights. Accordingly, the Court **DENIES** Defendant's Motion to Suppress [**Doc. 33**].

The Clerk is directed to send a copy of this written opinion and order to counsel and the Defendant, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTERED: June 25, 2021

Frank W. Volk
United States District Judge